FILED IN OPEN COURT
JACKSONVILLE, FLORIDA

6/9/26

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 3:26-cr-15-HES-PDB

ANNY CHEN
    a/k/a Qianhua Chen

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, and the defendant, ANNY CHEN, and the attorneys for the defendant, Cathy A. Fleming, Esq., and Janet E. Johnson, Esq., mutually agree as follows:

**A.    Particularized Terms**

1.    Counts Pleading To

The defendant shall enter a plea of guilty to Counts One and Three of the Indictment. Count One charges the defendant with conspiracy to commit an offense against the United States, specifically engaging in marriage fraud in violation of 8 U.S.C. § 1325(c), all in violation of 18 U.S.C. § 371. Count Three charges the defendant with conspiracy to commit an offense against the United States, specifically bribing a public official in violation of 18 U.S.C. § 201(b)(1)(A) and (C), all in violation of 18 U.S.C. § 371

Defendant's Initials _A C_                              AF Approval _CJL_

2.    Maximum Penalties

Counts One and Three are punishable by a term of imprisonment of not more than five years, a fine of not more than $250,000, or a term of imprisonment and a fine, a term of supervised release of not more than three years, and a mandatory special assessment of $100 due on the date of sentencing.  A violation of the terms and conditions of supervised release carries a maximum sentence of not more than two years' imprisonment, as well as the possibility of an additional term of supervised release.

Cumulatively, Counts One and Three are punishable by a term of imprisonment of not more than ten years, a fine of not more than $500,000, or a term of imprisonment and a fine, a term of supervised release of not more than three years, and a mandatory special assessment of $200 due on the date of sentencing.  A violation of the terms and conditions of supervised release carries a maximum sentence of not more than four years' imprisonment, as well as the possibility of an additional term of supervised release

3.    Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One/Three are:

(1)    two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit

Defendant's Initials _A C_                    2

marriage fraud in violation of 8 U.S.C. § 1325(c) (for Count One), or bribery of a public official in violation of 18 U.S.C. § 201(b)(1)(A) and (C) (for Count Three), as charged in the Indictment;

(2)   the defendant knew the unlawful purpose of the plan and willfully joined in it;

(3)   during the conspiracy, one of the conspirators knowingly engaged in at least one overt act described in the Indictment; and

(4)   the overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

4.   No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to her specific conduct particularly described in this plea agreement.

5.   Count Dismissed

At the time of sentencing, the remaining count against the defendant, Count Two, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

6.   Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States

Defendant's Initials _A C_                    3

will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

7.      Cooperation - Substantial Assistance to Be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all

Defendant's Initials _AC_                    4

relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8.    Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of

Defendant's Initials _A C_                    5

defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

9.    Cooperation - Responsibilities of Parties

a.    The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime.  However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.    It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)    The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)    The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either

Defendant's Initials _A C_                6

seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recission of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers,

Defendant's Initials A C                    7

documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)    The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

10.    Abandonment of Property

The defendant acknowledges that she has an ownership interest in the following items of property that are in the lawful custody of the United States:

a.  $3,600 in U.S. Currency

The defendant understands that she has the right and opportunity to claim the $3,600 total cash she paid directly or indirectly to a confidential source on February 14, 2025, as set forth in the Factual Basis.  The defendant hereby knowingly and voluntarily waives all right, title, and interest in the listed property. The defendant waives, releases, and withdraws any claim that the defendant has made with respect to the listed property, and waives and releases any claim that the defendant might otherwise have made to the listed property in the future.

The defendant consents to the vesting of title to the listed property to the United States Government, pursuant to Title 41, Code of Federal Regulations, Section 128-48.102-1.  The defendant also consents to the destruction of the property,

Defendant's Initials  A C                    8

or other disposition of the property in accordance with law, and without further notice to the defendant.

The defendant waives any right the defendant might otherwise have had to receive notice or a hearing with respect to any motion, pleading, order, or any other action that the Government might take, in its sole discretion, to carry out the abandonment, disposition, and/or destruction of the listed property. The defendant's waiver includes, without limitation, all common law, statutory, and constitutional claims or challenges, on any grounds, arising at any time from, or relating to, the seizure, abandonment, disposition, and destruction of the listed property, including any such claim for attorney's fees and litigation costs.

The defendant further agrees to hold the United States of America, its agents and employees, harmless from any claims whatsoever in connection with the seizure, abandonment, disposition, and destruction of the listed property.

11.   Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) whether in the possession or control of the United States, the defendant or defendant's nominees.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any

Defendant's Initials _A C_          9

forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

If the United States seeks the forfeiture of specific assets pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered.  In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing.  To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years.  The defendant further agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8

Defendant's Initials A C                    10

will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be

Defendant's Initials A C                    11

binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed forfeiture amount, is collected in full.

**B.** **Standard Terms and Conditions**

    1.    <u>Restitution, Special Assessment, and Fine</u>

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

Defendant's Initials A C          12

2. <u>Supervised Release</u>

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3. <u>Immigration Consequences of Pleading Guilty</u>

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4. <u>Sentencing Information</u>

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5. <u>Financial Disclosures</u>

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office

Defendant's Initials _A C_                    13

within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that her financial statement and disclosures will be complete, accurate and truthful and will include all assets in which she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared

Defendant's Initials _A C_                    14

by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises

Defendant's Initials _A C_                15

its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from her waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.   Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.   Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.   Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete

Defendant's Initials A C                    16

satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11. Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

Defendant's Initials AC          17

12. <u>Entire Agreement</u>

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13. <u>Certification</u>

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _____ day of ___June___ 2026.

GREGORY W. KEHOE
United States Attorney

_____
ANNY CHEN
Defendant

_____
DAVID B. MESROBIAN
Assistant United States Attorney

_____
CATHY A. FLEMING
JANET E. JOHNSON
Attorneys for Defendant

_____
MICHAEL J. COOLICAN
Assistant United States Attorney
Chief, Jacksonville Division

Defendant's Initials __AC__          18

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                      CASE NO. 3:26-cr-15-HES-PDB

ANNY CHEN
    a/k/a Qianhua Chen

## **PERSONALIZATION OF ELEMENTS**

**As to Count One:**

1.      Do you admit that in the Middle District of Florida and elsewhere, beginning no later than in or around March 2024, and continuing through in or around February 2025, you and at least one other person agreed to try to accomplish a common and unlawful plan to commit marriage fraud in violation of 8 U.S.C. § 1325(c), as charged in the Indictment?

2.      Do you admit that you knew the unlawful purpose of the plan and willfully joined in it?

3.      Do you admit that during the conspiracy, one of the conspirators knowingly engaged in at least one overt act described in the Indictment, including that in August 2024, you traveled with Raymond Zumba and Linlin Wang to Jacksonville to meet with Brinio Urena, at which time Urena agreed to marry Wang, a Chinese national, in exchange for a cash payment?

Defendant's Initials _AC_          19

4.  Do you admit that the overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy?

**As to Count Three:**

1.  Do you admit that in the Middle District of Florida and elsewhere, beginning no later than in or around November 2024, and continuing through on or about February 14, 2025, you and at least one other person agreed to try to accomplish a common and unlawful plan to commit bribery of a public official in violation of 18 U.S.C. § 201(b)(1)(A) and (C), as charged in the Indictment?

2.  Do you admit that you knew the unlawful purpose of the plan and willfully joined in it?

3.  Do you admit that during the conspiracy, one of the conspirators knowingly engaged in at least one overt act described in the Indictment, including that on or about February 14, 2025, you, Raymond Zumba, and Hailing Feng met CS-1 at a restaurant in Jacksonville, Florida, to exchange money for unauthorized military dependent identification cards?

4.  Do you admit that the overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy?

Defendant's Initials _AC_                    20

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 3:26-cr-15-HES-PDB

ANNY CHEN
     a/k/a Qianhua Chen

## **FACTUAL BASIS**

The Immigration and Nationality Act ("INA") governed the

immigration laws of the United States.  Pursuant to the INA, non-citizens of the

United States ("aliens") generally were not permitted to permanently reside in the

United States unless they were lawful permanent residents ("LPRs").

A United States citizen seeking to assist a relative who was an alien in

obtaining LPR status in the United States was required to file United States

Citizenship and Immigration Services ("USCIS") Form I-130, Petition for Alien

Relative.  An alien seeking to obtain LPR status in the United States was required to

file USCIS Form I-485, Application to Register Permanent Residence or Adjust

Status.

When a United States citizen filed a Form I-130 petition for an alien

spouse, a visa could be immediately available to the alien spouse upon the approval

of Form I-130, because the spouse was an immediate relative.  Immediate relatives

had special immigration priority and did not have to wait in line for a visa number to

become available for them to immigrate because there were an unlimited number of

Defendant's Initials _AC_

visas for spouses of United States citizens. An immediate relative relationship generally allowed the alien spouse to apply on Form I-485 to become an LPR either at the same time or subsequent to their United States citizen spouse filing Form I-130.

Once USCIS approved an alien for LPR status, the agency issued the alien an LPR card (Form I-551 or "green card"). The LPR card authorized the alien to lawfully reside and work in the United States.

Beginning no later than in or about March 2024, and continuing through in or about February 2025, in the Middle District of Florida and elsewhere, the defendant, Anny Chen, did knowingly and willfully combine, conspire, confederate, and agree with others, including Raymond Zumba, Sha Xie, Lin Lin Wang, Brinio Urena, Jiawei Chen, Yafeng Deng, Hailing Feng, Kiah Holly, Xionghu Fang, Tao Fan, Jaden Bullion, Kin Man Cheok, and others known and unknown to the United States, to enter and arrange sham marriages between U.S. citizens and Chinese nationals. The purpose of the fraudulent marriages was to evade immigration laws and to attempt to illicitly obtain beneficial immigration status for the Chinese nationals, thereby obstructing USCIS in its administration of the immigration laws of the United States.

The defendant is naturalized U.S. citizen, born in China in or around 1971. She moved to the United States in or around 2015, and became a naturalized U.S. citizen in or around 2025. At all relevant times, the defendant was living in the New York City area.

Defendant's Initials _AC_                    2

At an unknown time, but not later than in or around March 2024, the defendant entered the business of arranging sham marriages between Chinese nationals and U.S. citizens for the purpose of evading U.S. immigration laws and illicitly obtaining beneficial immigration status for the Chinese nationals. She and other conspirators obtained an office in New York City from which the scheme was run. The sham marriage scheme was advertised, among other ways, through word-of-mouth and referrals. In general, the Chinese nationals seeking to enter a sham marriage paid the defendant or her conspirators a set fee. The defendant along with her conspirators would identify and recruit U.S. citizens as sham spouses, arrange the logistics of the sham marriages, handle the filing of the immigration paperwork after the wedding (including obtaining any necessary documents from the spouses), and pay the U.S. citizen certain established fees after the wedding ceremony, green card, and divorce were achieved. The conspirators particularly sought U.S. citizens serving in the armed forces as sham marriage spouses, and often requested that the U.S. citizens obtain military dependent identification cards (discussed further below) for the Chinese nationals after the wedding.

For example, in or around March 2024, Xie paid one of the defendant's co-conspirators to engage in a sham marriage. The defendant and another conspirator recruited Zumba to join the conspiracy by marrying Xie, applying for and obtaining Xie's green card, and then divorcing Xie. In exchange, Zumba would receive $35,000 via installment payments of $10,000 (marriage), $20,000 (green card), and $5,000 (divorce). On or about April 4, 2024, Xie and Zumba got married

Defendant's Initials A C

3

in Brooklyn, New York, having never met each other before. After the wedding, the defendant, Xie, and Zumba attended a party held to celebrate the sham wedding and substantiate its purported legitimacy by taking pictures to be used for immigration application purposes. At the party, the defendant gave Zumba $10,000 in cash for marrying Xie. Following her wedding, Xie continued to live and work on the West Coast, while Zumba continued to live and work in New York. She never lived as husband and wife with Zumba. On or about May 15, 2024, the defendant and other conspirators submitted a Form I-485 petitioning for permanent resident status for Xie.

Zumba subsequently went to work for the defendant and other conspirators as a recruiter of U.S. citizens to participate in the scheme in exchange for a finder's fee. In or around May 2024, Zumba contacted Urena and recruited him to enter into a sham marriage with a Chinese national in exchange for a cash payment. Urena ultimately agreed to marry a Chinese national, Wang, whom he had never met, in exchange for an initial payment of $10,000 and the possibility of more payments in the future, including after Wang obtained legal immigration status. In August 2024, the defendant, Zumba, Wang, and at least one other individual traveled from New York to Jacksonville to meet with Urena. On August 31, 2024, Urena married Wang in Jacksonville. After the wedding, Urena met with the conspirators at a hotel room and received a cash payment for marrying Wang. The defendant and Zumba also asked Urena to obtain a military identification card for Wang because it would facilitate the "immigration process." Urena also later

Defendant's Initials AC                    4

agreed to work for the defendant and other conspirators as a recruiter of U.S. citizens.

The defendant subsequently facilitated sham marriages between other Chinese nationals and U.S. citizens recruited by Zumba and Urena, including Chambers and Jiawei Chen, Bailey and Fan, Holly and Fang, and others. For these marriages, the fees to be paid to the U.S. citizens were similar: a total of $35,000, paid in three installments. The defendant often provided the U.S. citizen spouses with their cash payments after the wedding ceremony. Further, beginning in or around October 2024, the defendant employed Feng as a translator and facilitator in the marriage fraud scheme, assisting with the logistics of recruiting spouses, arranging sham weddings, and collecting documents to be used in fraudulent immigration applications. In or around December 2024, the defendant and Zumba traveled to Hong Kong and Malaysia. During that trip, two sham weddings occurred between foreign nationals and U.S. citizens, which the defendant facilitated.

During the investigation, law enforcement identified numerous messages sent via text or encrypted messaging applications between the conspirators in furtherance of the marriage fraud and bribery conspiracies. For example, investigators identified a Whatsapp group created on or about February 8, 2025, in which Zumba, Urena, Feng, and the defendant were the participants. The group was titled "Moneymakers." In the messages, the conspirators discussed potential sham marriages and recruitment efforts, including an individual from Jacksonville

Defendant's Initials __AC__                    5

recruited by Urena whom the conspirators planned to meet. On February 11, 2025, the defendant sent a message in that group which stated: "Brinio, I've been thinking about it for a long time. You and Raymond should work for immigration. It's much more convenient."

The defendant also arranged a sham marriage between Deng, an active-duty Navy servicemember stationed in Japan, and a Chinese national. In September 2024, Deng sent a message to the defendant via WeChat, a China-based encrypted messaging, social media, and mobile payment application. According to messages lawfully obtained by investigators and translated from Chinese by a Federal Bureau of Investigation linguist, Deng initiated the conversation by stating that he had been provided the defendant's contact information by a friend, and asked: "I am a US citizen, and a male born in 2002. I want to ask if you have anybody who wants to get green card. I was married once before, but did not help her get green card." The defendant asked Deng to talk on the phone. Deng then sent several selfie photographs of himself to the defendant, including one taken in his quarters wearing his Navy uniform.

Over the next several weeks, the defendant and Deng discussed the marriage fraud scheme via WeChat text and voice messages, and arranged for Deng to marry a Chinese national in exchange for a cash payment. With respect to his payments, the defendant informed Deng: "It works like this. The day when you two get the marriage license, she will pay $28,000. . . . [W]hen the green card is issued, will pay $30,000. The rest 5 grand, she won't pay until after the divorce." The

Defendant's Initials _A C_         6

defendant later explained that U.S. citizens of Chinese origin were paid more for participating in the scheme by marrying a foreign national than U.S. citizens of non-Chinese origin.  When Deng complained that he was going to be paid less because he had been divorced before, the defendant stated, "Let me tell you. There is an industry practice.  Divorced once, one price; divorced twice, another price; no divorce, other price.  There are customary charges in this business.  This practice is consistent."

The defendant stated that after the wedding, Deng would have to get his wife a "military dependent ID."  She explained that after Deng helped his spouse complete her "paperwork," there would be a "20% chance" that they would be interviewed by immigration authorities.  Deng asked the defendant, "What is the estimated time for successful divorce after the marriage?"  The defendant replied, "This takes about 3 years to complete."  The defendant also advised Deng that Fang had recommended Deng marry a "higher class" client who rented an apartment in Fang's apartment building in Manhattan.

Ultimately, Deng agreed to join the conspiracy by marrying a Chinese national, facilitating her green card application, and then divorcing her.  Deng requested leave from the Navy and traveled to New York from Japan on or about November 12, 2024.  According to messages reviewed by investigators, Fang agreed to pick Deng up from the airport and allowed him to stay in his apartment.  On or about November 14, 2024, Deng married the individual identified in the Indictment as Conspirator-C, a Chinese national.  Their marriage certificate filed with the Clerk

Defendant's Initials _AC_                    7

of the City of New York falsely stated that they lived together in an apartment in Fang's building. Deng was provided with a cash payment for engaging in the sham marriage.

After Deng returned to Navy duty, he and the defendant continued to exchange messages via WeChat. They discussed Deng's efforts to recruit other individuals to join the conspiracy by marrying Chinese nationals. The defendant requested Deng's assistance with obtaining a military identification card for Fang because Fang's spouse (Holly) had not done so yet. Deng also advised the defendant on or about December 11, 2024, that Conspirator-C had obtained her military dependent identification card and was "very happy." The defendant asked Deng if she could get a military dependent ID for herself. Deng stated that the defendant had to be his relative, and "there is no reason to take such a big risk to get this card." The defendant replied that "it's really cheap to buy groceries with" the card. On or about January 5, 2025, the defendant sent Deng a photograph of an application for military dependent identification card bearing Holly and Fang's information, and asked if Deng could determine if it had been processed

In January 2025, a confidential source (CS-1), a resident of Jacksonville in the Middle District of Florida, met with a Special Agent with the Naval Criminal Investigative Service (NCIS) and provided information about Zumba and his suspected involvement with criminal activity. CS-1 was on active duty in the Navy and previously had served with Zumba aboard USS Carney, a guided missile destroyer. CS-1 told the NCIS agent, among other things, that in late November

Defendant's Initials _AC_                    8

2024, Zumba and CS-1 met at a bar in Jacksonville, Florida. During their meeting, CS-1 noticed Zumba seemed to have a significant amount of money. CS-1 stated he knew Zumba was now in the Navy Reserves and questioned Zumba about his wealth. Zumba explained to CS-1 that Zumba had recently married a Chinese national.

CS-1 further reported to NCIS that on January 23, 2025, he spoke with Zumba via a Snapchat voice call, a portion of which was recorded. During this call, Zumba and CS-1 discussed how CS-1's spouse worked in the office at Naval Air Station Jacksonville, in Jacksonville, Florida (hereinafter "NAS Jax") that issues "CAC Cards." Zumba asked if CS-1 and his spouse could issue unauthorized but real "CAC Cards" for ZUMBA's "in-laws," in exchange for an under-the-table payment. CS-1 asked how much Zumba would pay, and he replied, $1,500 per card. Zumba said he just wanted to make sure the cards went through and reiterated that "the money is there." CS-1 stated that he would look into it to ensure that the cards would not be flagged as illegal activity.

The "Common Access Card," commonly known as a "CAC" or "CAC Card," is a smart card that serves as a standard form of legal identification issued by the United States Department of Defense (DoD). The CAC is the standard legal identification for active-duty uniformed service personnel, selected reserve personnel, DoD civilian employees, and eligible contractor personnel. It allows eligible individuals to access DoD facilities. Other individuals, such as dependent family members or foreign affiliate military personnel, are not eligible to receive CACs, but

Defendant's Initials AC

9

rather can obtain a different type of legal identification known as the Uniformed Services ID Card ("USID"), which also allow entrance into DoD facilities. During the conversations set forth below, the defendant and CS-1 used the terms "cards," "CACs," and "CAC Cards" interchangeably. The "cards" that the defendant solicited CS-1 and his spouse (hereinafter "CS-2") to create were USIDs. CS-2 worked as a government contract employee in the Personnel Services Detachment (PSD) at NAS Jax. As part of her official duties, CS-2 processed and issued CACs and USIDs for eligible applicants.

After reporting this and other information to NCIS, CS-1 stayed in contact with Zumba at the direction of law enforcement. At the direction of law enforcement, between January 24 and February 13, 2025, CS-1 exchanged text messages and recorded a series of at least nine calls with Zumba. During these calls, Zumba both arranged to pay CS-1 and CS-2 a bribe for the unauthorized military identification cards for Chinese nationals, as well as recruiting them to join the marriage fraud conspiracy.

During one call, when asked who the cards would be for, Zumba initially hesitated and then replied that the cards were for his "wife's parents." CS-1 asked Zumba where they were coming from and where the Zumba's wife was from, and Zumba replied they were from China (hereinafter referred to as the "Chinese buyers"). CS-1 asked what the cards would be used for, and Zumba said they were for immigration purposes to show that the Chinese buyers were married to servicemembers. Zumba initially stated that he had told the Chinese buyers that they

Defendant's Initials _A C_                    10

could not use the cards to enter military facilities, but when CS-1 asked if the cards needed to be enabled for base access, Zumba said he needed to check with the buyers. Zumba then said the cards would only have to be active for a few months, and one of the Chinese buyers wanted to use the card to go on base for shopping. CS-1 asked if Zumba wanted to obtain cards for other individuals, and Zumba stated, "if it works out smoothly, why not."

During a call on February 8, 2025, Zumba told CS-1, among other things, that when they met in person, they could talk about the marriage scheme that they had previously discussed. Zumba stated that CS-1 had an advantage because CS-1 is "still in" (referring to CS-1's active-duty Navy status). CS-1 inquired about how much CS-1 and his current spouse (CS-2) would be paid for participating in fraudulent marriages in the future. Zumba replied that they would make $35,000 each.

Ultimately, Zumba arranged with CS-1 that Zumba would come to Jacksonville with the Chinese buyers to obtain the USIDs, and to further discuss marriage fraud. Zumba told CS-1 that one card had to be active with the ability to access military facilities, but a second one did not, and again requested a price because the Chinese buyers would be bringing cash. CS-1 stated the price would be $2,500 for the active CAC because it could "get everyone in trouble," and $1,000 for the other card. Zumba stated that the Chinese buyers would pay, but they required that the cards worked to get onto base, and they would be upset if the cards did not work. Zumba advised CS-1 that he would bring the Chinese buyers onto NAS Jax to

Defendant's Initials _AC_                    11

meet CS-2 and obtain the cards, and that he had previously brought them onto another (unspecified) facility, telling the gate guards they were his family.

Zumba and CS-1 ultimately arranged to meet at the PSD at NAS Jax after regular business hours on February 13, 2025, so that CS-2 could take fingerprints and photographs to produce the cards. CS-1 stated that the cards would not be ready until the next day. After CS-1 asked if some of the money could be paid up front, Zumba explained that one of the Chinese buyers did not object to that, but the other had previously tried to obtain a card and got "screwed over." CS-1 discussed continuing the scheme after this first attempt and Zumba stated that if this went well, there would be one more person. CS-1 asked how they would be paid, and Zumba stated "cash . . . no traces bro." Zumba stated that unspecified Chinese individuals paid for his personal travel, including a trip to Las Vegas and a potential trip to Miami. Zumba stated he was "entitled" to have trips and dinners paid for by the Chinese.

CS-1 and Zumba discussed meeting at the PSD on NAS Jax at around 6:00 or 7:00 p.m. on February 13, so CS-2 could take fingerprints and pictures to enter into the system. CS-1 advised Zumba that CS-2 would pick up the cards the next morning (February 14), and CS-1 would bring them to Zumba later that day. Zumba stated that a male Chinese buyer now wanted an "active" card that would also allow him to go on base and "shop," but that the male Chinese buyer wanted to know what else he would have access to on a DoD facility. CS-1 asked if he was

Defendant's Initials _AC_                    12

referring to medical care or recreational facilities, to which Zumba said he was "just relaying the message."

On February 13, 2025, at approximately 6:45 p.m., CS-1 and CS-2 were in the parking lot of the PSD within the confines of NAS Jax.  Zumba arrived in a white Lexus SUV, accompanied by three other individuals (Feng, Cheok, and the defendant).  CS-1 and Zumba greeted each other and the other parties introduced themselves including CS-2.

While the defendant, Feng, and Cheok went inside the PSD, Zumba and CS-1 met in the SUV in the parking lot.  This meeting was audio-recorded.  According to CS-1, while showing CS-1 an amount of cash, Zumba stated, "This is your insurance. . . . This is 35 ok, so if you want to count it right now, you can count it right now, or if you want to wait 'til tomorrow so you can count it, 'cus they told me to give it to you tomorrow so when we get the cards and then whatever.  But this is just to show you [], this is going to be your money tomorrow."  After CS-1 asked if the money was for three cards, Zumba advised that Feng was only there to translate for the defendant and Cheok, and it was $3,500 for the two cards as previously discussed.  Zumba advised CS-1 that if this deal was successful, then other individuals would also be interested in obtaining USIDs.  Zumba also told CS-1 more about the marriage fraud scheme.  He told CS-1 that he and CS-2 could be paid $35,000 each to get married, with $10,000 up front.

Meanwhile, CS-2 escorted Feng, Cheok, and the defendant into the PSD.  The lights in the PSD were off, and upon entry, CS-2 locked the door from the inside.

Defendant's Initials _A C_                    13

Feng translated at certain times what CS-2 said into Chinese for the defendant and Cheok. CS-2 asked Feng what type of identification card the defendant and Cheok wanted. Feng stated that they did not want "CAC cards," but rather the "military service ID card," i.e., USIDs, and that the defendant requested a fully operating card. CS-2 then processed the defendant and Cheok for USIDs, taking photographs and fingerprints. During the processing, CS-2 made several references to their meeting occurring after normal business hours and outside normal practice. Later that evening, the defendant, Zumba, Feng, and Cheok met with co-conspirators Urena and Bullion (both Jacksonville residents) at a hotel in Jacksonville.

On February 14, 2025, CS-1 made a recorded call to Zumba. CS-1 advised Zumba there was an issue with the PSD computer that had deleted the photos of the defendant and Cheok, but that CS-2 had been able to use their other identification photos to create the cards. CS-1 advised Zumba that if he wanted to do future identification cards "remotely" without driving to Jacksonville, they had found the "cheat code" to do so. Zumba expressed his excitement at that prospect, and asked if cards could be mailed to him in the future. Zumba confirmed that they would meet at 11:30. The purpose of the meeting was to exchange the bribe money for the cards.

At approximately 11:30 a.m., CS-1 arrive at the parking lot outside the restaurant where the meeting with Zumba and the Chinese buyers was to occur. Zumba came out of the restaurant, greeted CS-1, and got into the white Lexus with CS-1. Inside the vehicle, Zumba gave CS-1 $3,500 in cash in exchange for two

Defendant's Initials _A C_                14

USIDs bearing the defendant and Cheok's images, which had been created for the purpose of the operation. The investigation later revealed that the defendant gave Zumba the cash, which had been provided by Cheok. CS-1 and Zumba then went into the restaurant, and had lunch with the defendant and Feng. This meeting was also recorded and the parties discussed, among other things, marriage fraud. After CS-1 told the conspirators that he and CS-2 were interested in joining the scheme, Zumba suggested that they start a group chat together. He stated that he would need three years of their tax returns and pictures of CS-1's passport, CAC card, and their birth certificates. Zumba informed CS-1 that he would be required to change his residence to a New York address. At the end of the lunch, the defendant gave CS-1 $100 as a "tip."

During the lunch, the surveillance video showed that the defendant was frequently using her phone. According to law enforcement review of the WeChat messages between the defendant and Deng, on February 14, 2025, the defendant messaged Deng, stating that she had successfully obtained a "military dependent ID." The defendant stated that her friend who was an "officer in the military" had arranged to have a "subordinate" create a card for her after hours. The defendant told Deng, "I can go to any military base at any time with this card. I can enter military supermarkets at any time. . . . And I'll have access to all the military medical care, including dental care without having to pay." Deng congratulated the defendant on obtaining the card.

Defendant's Initials _A C_                    15

After the lunch, agents with Homeland Security Investigations (HSI), NCIS, and the Jacksonville Sheriff's Office detained the defendant, Zumba, and Feng. During a voluntary recorded interview with Zumba, he told law enforcement that the conspirators had driven to Jacksonville because "they just wanted cards. That's it. They just wanted cards. . . . I told them not to have base access cards, just cards." The defendant also consented to an interview after being advised of her rights. She admitted knowing that she could not legitimately obtain a military identification card, and acknowledged that they were going to pay CS-1 to obtain the cards. The defendant denied that her company was involved in marriage fraud, and made various false statements to hide and conceal the purposes of the marriage fraud conspiracy, including, among others, that Xie and Zumba lived together on Staten Island and went on vacations together, and that Zumba had not been paid money to marry Xie.

Defendant's Initials _A C_                    16